**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **NATHALY CORTEZ, individually and** | § | |
| **on behalf of similarly situated individuals** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO.  4:21-cv-03991** |
| | § | |
| **CASA DO BRASIL, LLC** | § | |
| | § | |
| **Defendant** | § | |

**DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION TO AUTHORIZE NOTICE**
**TO POTENTIAL PLAINTIFFS AND BRIEF IN SUPPORT**

**Ramon D. Bissmeyer**
State Bar No. 00787088
So. Dist. No. 17446
**DYKEMA GOSSETT PLLC**
112 East Pecan Street, Suite 1800
San Antonio, Texas 78205
Telephone:  (210) 554-5500
Facsimile:   (210) 226-8395
Email:  rbissmeyer@dykema.com

and


**Elizabeth A. Voss**
State Bar No. 24075160
So. Dist. No. 1241751
**DYKEMA GOSSETT PLLC**
1717 Main Street, Suite 4200
Dallas, Texas 75201
Telephone:  (214) 462-6400
Facsimile:  (214) 462-6401
Email:  evoss@dykema.com

**ATTORNEYS FOR DEFENDANT**
**CASA DO BRASIL, LLC**

1

## TABLE OF CONTENTS

I.    STATEMENT OF NATURE AND STATE OF PROCEEDING ......................................6

II.   STATEMENT OF THE ISSUES...............................................................................6

    A.    Whether Plaintiffs have met their burden of showing that a collective action is appropriate pursuant to the Fifth Circuit's decision in *Swales v. KLLM Transp. Servs., LLC*, 985 F.3d 430 (5th Cir. 2021). .....................................6

    B.    Whether notice should be issued to all of the individuals in the class of employees identified by Plaintiffs. ..........................................................................8

    C.    Whether the information and notices sought by Plaintiffs are appropriate, if the Court determines that notice should be issued. ...............................................9

III.  SUMMARY OF ARGUMENT ...................................................................................10

IV.   PLAINTIFFS HAVE NOT DEMONSTRATED THAT THERE ARE SIMILARLY SITUATED INDIVIDUALS WHO MAY PARTICIPATE IN THIS CAUSE. ..............................................................................................................11

    A.    Employees Were Provided the Required Tip Credit Notice. ...............................11

    B.    Credit Card Tips Were Not Kept by Defendant....................................................15

    C.    Deductions From Cash Tips Were Uncommon, and Plaintiffs Cannot Show That All Servers, Bartenders and Gauchos Were Impacted. ......................17

    D.    CSRs Were Not Improperly Included in the Tip Pool. ........................................19

        1.    Claims Regarding Payment of a Salary to CSRs Are Incorrect and Irrelevant. ................................................................................20

        2.    CSRs Do Not Manage the Enterprise or a Department Thereof...............21

        3.    CSRs Do Not Direct the Work of Two or More Employees. ...................24

        4.    CSRs Do Not Have Authority to Hire or Fire Employees........................25

        5.    Plaintiffs Failed to Prove that CSRs Meet the DOL's Definition of Managers or Supervisors...............................................................26

    E.    Edits to Time Records Demonstrate that Employees Are Not Similarly Situated. ..............................................................................................................26

V.    NOTICES SHOULD NOT BE ISSUED TO ALL SERVERS, BARTENDERS AND GAUCHOS...................................................................................................31

VI.   THE COURT SHOULD NOT REQUIRE THE PRODUCTION OF INFORMATION SOUGHT BY PLAINTIFFS NOR PROVIDE THE NOTICES REQUESTED. .........................................................................................................31

VII.  CONCLUSION..........................................................................................................36

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Bernal v. Vankar Enterprises, Inc.*,
   579 F. Supp. 2d 804 (W.D. Tex. 2008)....................................................................12

*Bishop v. AT&T Corp.*,
   256 F.R.D. 503 (W.D. Penn. 2009) .........................................................................33

*Byard v. Verizon W. Va., Inc.*,
   287 F.R.D. 365 (N.D. W. Va. 2012) .......................................................................34

*Eltayeb v. Deli Mgmt.*,
   No. 4:20-CV-00385, 2021 U.S. Dist. LEXIS 238778 (E.D. Tex. Dec. 14, 2021)....9

*Eshelman v. MPFL, LLC*,
   No. 4-20-cv-3119, 2022 U.S. Dist. LEXIS 120720 (S.D. Tex. June 22, 2022) ........9

*Garcia v. TWC Admin.*,
   LLC, No. SA:14-CV-985-DAE, 2015 U.S. Dist. LEXIS 50384 (W.D. Tex. April 16, 2015) 10

*Gill v. Concord EMS*,
   No. 4:20-CV-528, 2021 U.S. Dist. LEXIS 166825 (S.D Tex. Aug. 11, 2021) .........9

*Guillory v. PFB Mgmt., LP*,
   No. H-11-4377, 2013 U.S. Dist. LEXIS 39484 ......................................................13

*Gustavus v. Cazos, Inc.*,
   774 F. Supp. 2d 856 (S.D. Tex. 2011) ....................................................................12

*Harris v. Vector Mktg. Corp.*,
   716 F. Supp. 2d 835 (N.D. Cal. 2010) ....................................................................32

*Harvey v. AB Electrolux*,
   857 F. Supp. 2d 815 (D. Iowa Mar. 9, 2012)..........................................................33

*Hoffman-La Roche Inc., v. Sperling*,
   493 U.S. 165 (1989)...........................................................................................7, 8, 9

*Kilgore v. Outback Steakhouse of Florida, Inc.*,
   160 F.3d 294 (6th Cir. 1998) ..................................................................................12

*Lentz v. Spanky's Restaurant II, Inc.*,
   491 F. Supp. 2d 663 (N.D. Tex. 2007) ...................................................................12

*Lusardi v. Xerox Corp.*,
    118 F.R.D. 351 (D.N.J. 1987) .......................................................................6

*McKnight v. D. Houston, Inc.*,
    No. H-09-3345, 2010 U.S. Dist. LEXIS 129634 (S.D. Tex. Dec. 8, 2010)............................33

*Montano v. Montrose Rest. Assocs., Inc.*,
    800 F.3d 186 (5th Cir. 2015) ......................................................................11

*Ott v. Publix Super Mkts.*,
    298 F.R.D. 550 (M.D. Tenn. 2014) ........................................................10, 33

*Pedigo v. Austin Rumba, Inc.*,
    722 F. Supp. 2d 714 (W.D. Tex. 2010)......................................................12

*Russell v. Ill. Bell Tel. Co.*,
    575 F. Supp. 2d 930 (N.D. Ill. 2008) ..........................................................33

*Spence v. Irving Holdings, Inc.*,
    No. 3:10-cv-142, 2010 U.S. Dist. LEXIS 140329 (N.D. Tex. Dec. 15, 2010) .......................34

*Swales v. KLLM Transp. Servs., LLC*,
    985 F.3d 430 (5th Cir. 2021) ...................................................... *passim*

*Thrower v. Universal Pegasus, Int'l Inc.*,
    484 F. Supp. 3d 473 .......................................................................32

*Vogt v. Tex. Instruments, Inc.*,
    No. 3:05-CV-2244, 2006 U.S. Dist. LEXIS 67226 (N.D. Tex. Sept. 19, 2006) ......................9

*In re Wells Fargo Wage & Hour Emp't Practices Litig.*,
    No. H-11-2266, 2013 U.S. Dist. LEXIS 70040 (S.D. Tex. May 17, 2013)............................33

**Statutes**

29 U.S.C. § 203(m) ..........................................................................11

29 U.S.C. § 203(m)(2)(A)(ii) .................................................................12

29 U.S.C. § 206(a)(1)(C) .....................................................................11

29 U.S.C. § 213(a)(1) .........................................................................20

29 U.S.C. § 216(b) ..........................................................................6, 7

Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ...........................................6

Portal-to-Portal Act ...........................................................................7

4870-1961-5542.2

**Other Authorities**

29 C.F.R. §§ 531.52(b)(2) ..................................................................................19, 20, 21

29 C.F.R. § 531.52(c)(3) ........................................................................................19, 21

29 C.F.R. § 531.54(c)(3) ........................................................................................19, 20

29 C.F.R. § 541.100(a) ...............................................................................................20

29 C.F.R. § 541.100(a)(1) ..........................................................................................20

29 C.F.R. § 541.100(a)(2) ..........................................................................................21

29 C.F.R. § 541.100(a)(2) – (4) ..........................................................................20, 26

29 C.F.R. § 541.100(a)(3) ..........................................................................................24

29 C.F.R. § 541.100(a)(4) ..........................................................................................25

29 C.F.R. § 541.101 ....................................................................................................20

29 C.F.R. § 778.113 ....................................................................................................20

32 Fed. Reg. 13575 (September 28, 1967) .................................................................19

73 Fed. Reg. 43654 (July 28, 2008) ...........................................................................12

85 Fed. Reg. 86756 (December 30, 2020) ..................................................................19

85 Fed. Reg. at 86789-90 ...........................................................................................19

86 Fed. Reg. 52973 (September 24, 2021) .................................................................19

TEX. DISCIPLINARY R. PROF'L CONDUCT 7.03 ................................................33

4870-1961-5542.2

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES Defendant Casa do Brasil, LLC ("Defendant" or "Casa do Brasil") and files this Response to Plaintiffs' Motion to Authorize Notice to Potential Plaintiffs and Brief in Support (the "Response") and in support hereof, respectfully states as follows:

## I.   STATEMENT OF NATURE AND STATE OF PROCEEDING

Plaintiff Nathaly Cortez filed her Original Complaint on December 7, 2021, alleging both minimum wage and overtime payment violations under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"), with respect to her former employment as a server at Defendant's restaurant in College Station, Texas and seeking to represent a class of allegedly similarly situated employees of Defendant.  (*See* Pl.'s Orig. Compl. [Dkt # 1] at 7-9).  Following discovery related to Plaintiff's allegations, and the filing on September 16, 2022 of the Notice of Filing of Consent by proposed opt-in plaintiff Joseph Felan [Dkt # 39], and the filing on September 19, 2022 of the Notice of Filing Consent by Proposed opt-in plaintiff Mario Candiani [Dkt # 40] (collectively, the "Opt-Ins"), Plaintiffs filed their Motion to Authorize Notice to Potential Plaintiffs [Dkt # 45] (the "Motion"), asking that the Court certify a class of servers, bartenders and Gauchos and authorize notice to potential class members to join the present lawsuit.  For the reasons stated herein, Defendant asks that the Court deny Plaintiffs' Motion.

## II.   STATEMENT OF THE ISSUES

### A.   Whether Plaintiffs have met their burden of showing that a collective action is appropriate pursuant to the Fifth Circuit's decision in *Swales v. KLLM Transp. Servs., LLC*, 985 F.3d 430 (5th Cir. 2021).

In *Swales*, the Fifth Circuit rejected the two-stage conditional certification process for FLSA collective actions previously devised in *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987).  Instead, *Swales* "embrace[d] interpretive first principles:  (1) the FLSA's text, specifically § 216(b), which declares (but does not define) that only those 'similarly situated' may proceed as

a collective; and (2) the Supreme Court's admonition that while a district court may 'facilitat[e]
notice to potential plaintiffs' for case-management purposes, it cannot signal approval of the merits
or otherwise stir up litigation." 985 F.3d at 434 (citations omitted). With respect to the first
principle, *Swales* recognized that the right to pursue a collective action was included in the FLSA's
Section 216(b), *see id*., and later amended through the Portal-to-Portal Act, "requiring similarly
situated employees to opt-in via written consent." *Id*. at 435. The Court then went on to state,
importantly, that "[t]he Portal-to-Portal Act takes into account the dual goals of collective actions:
(1) enforcement (by preventing violations and letting employees pool resources when seeking
relief); and (2) efficiency (by resolving common issues in a single action)." *Id*. (citation omitted).
"The trial court's notice-giving role is pivotal to advancing the goals and evading the dangers of
collective actions." *Id*. Noting, however, that *Hoffman-La Roche* does not "suggest[] that
employees have a right to receive notice of potential FLSA claims," *id*. at 435-36, *Swales* cautioned
that "[g]iven the real risk of abuse of the collective-action device, a court's 'intervention in the
notice process' cannot devolve into 'the solicitation of claims.'" *Id*. at 436 (*quoting Hoffman-La
Roche Inc., v. Sperling*, 493 U.S. 165, 174 (1989)).

Based upon these principles, and with respect to a court's decision with respect to notice
to potential opt-in plaintiffs, *Swales* instructed that "a district court must rigorously scrutinize the
realm of 'similarly situated' workers, and must do so from the outset of the case, not after a lenient,
step-one 'conditional certification.' Only then can the district court determine whether the
requested opt-in notice will go to those who are *actually similar* to the named plaintiffs." 985 F.3d
at 434. (emphasis added). *Swales* recognized that "[c]onsidering, early in the case, whether merits
questions can be answered collectively has nothing to do with endorsing the merits. Rather,
addressing these issues from the outset aids the district court in deciding whether notice is

necessary.  And it ensures that any notice sent is proper in scope – that is, sent only to potential plaintiffs.  *When a district court ignores that it can decide merits issues when considering the scope of a collective, it ignores the 'similarly situated' analysis and is likely to send notice to employees who are not potential plaintiffs*.  In that circumstance, the district court risks crossing the line from using notice as a case-management tool to using notice as a claims-solicitation tool.  *Hoffman-La Roche* flatly forbids such a thing."  *Id*. at 442 (emphasis added). "To determine, then, whether and to whom notice should be issued in this case, the district court needs to consider all of the available evidence."  *Id*.  "After considering all available evidence, the district court may conclude that the Plaintiffs and Opt-ins are too diverse a group to be 'similarly situated' . . . [and] that Plaintiffs have not meet their burden of establishing similarity."[1] *Id*. at 443.  "The bottom line is that the district court has broad, litigation-management discretion here.  To be sure, that discretion is cabined by the FLSA's 'similarly situated' requirement and the Supreme Court's decision in *Hoffman LaRoche*."  *Id*.

### B.  Whether notice should be issued to all of the individuals in the class of employees identified by Plaintiffs.

This Court is not required to decide merely between granting Plaintiffs' Motion and authorizing notice to all of the requested class members or denying the Motion, precluding notice to anyone else.  The Fifth Circuit recognized in *Swales* that a district court, faced with a request to send notice to allegedly similarly situated individuals, may "(1) 'conclude that the Plaintiffs' and Opt-ins are too diverse a group' to support a collective action; (2) ' decide that [the court] needs

---

[1] *Swales* made clear that it is Plaintiffs' burden to demonstrate that proposed class members are "similarly situated," holding that "such a burden follows from the general burden that a plaintiff bears to prove her case.  This makes sense as a practical matter as well, as a plaintiff should not be able to simply dump information on the district court and expect the court to sift through it and make a determination as to similarity."  985 F.3d at 443 n.65.

further discovery to make [a] determination';[2] or (3) 'find that only certain subcategories of' employees 'should receive notice.'" *Eltayeb v. Deli Mgmt.*, No. 4:20-CV-00385, 2021 U.S. Dist. LEXIS 238778, at *6-7 (E.D. Tex. Dec. 14, 2021) (*quoting Swales*, 985 F.3d 443); *Eshelman v. MPFL, LLC*, No. 4-20-cv-3119, 2022 U.S. Dist. LEXIS 120720, at *4 (S.D. Tex. June 22, 2022); *Gill v. Concord EMS*, No. 4:20-CV-528, 2021 U.S. Dist. LEXIS 166825, at *5 (S.D Tex. Aug. 11, 2021) (*citing Young v. Energy Drilling Co.*, 534 F. Supp. 3d 720 (S.D. Tex. 2021)).

**C. Whether the information and notices sought by Plaintiffs are appropriate, if the Court determines that notice should be issued.**

The Court has significant discretion in collective actions under the FLSA, including the discretion to authorize notice to potential plaintiffs that they may "opt-in" to the suit and discretion in monitoring the preparation and distribution of any notices to such individuals. *See, e.g., Vogt v. Tex. Instruments, Inc.*, No. 3:05-CV-2244, 2006 U.S. Dist. LEXIS 67226, at *5 (N.D. Tex. Sept. 19, 2006) (*citing Hoffman-LaRoche*, 493 U.S. at 169, 173) ("In exercising the discretionary authority to oversee the notice-giving process, courts must be scrupulous to respect judicial neutrality. To that end, trial courts must take care to avoid even the appearance of judicial endorsement of the merits of the action.").  Upon determining that the issuance of notice is appropriate, the district courts monitor the preparation and distribution of notice to ensure that it is timely, accurate and informative. *Hoffman-La Roche*, 493 U.S. at 171.  The district courts' exercise of discretion in monitoring the preparation and distribution of notice with respect to the

---

[2] On Friday, September 16, 2022 – only two (2) business days before Plaintiffs' Motion was filed – and Monday, September 19, 2022, the Opt-Ins joined this cause.  The Opt-Ins submitted Declarations in support of Plaintiffs' Motion dated the date on which the Motion was filed.  (*See* Decl. of M. Candiani [Dkt # 45-11]; Decl. of J. Felan [Dkt # 45-12]).  No discovery with respect to the Opt-Ins, including the matters included in their supporting Declarations, has been possible as of the filing of this Response.  To the extent that the Court finds information in the Opt-Ins' Declarations informative, Defendant asks that the Court allow Defendant to take their depositions and obtain written discovery from them prior to any ruling on Plaintiffs' Motion.

production and use of information other than the putative plaintiffs' names and addresses includes consideration of various factors, including: "(1) whether the plaintiff argues that the U.S. mail is inadequate; (2) whether communication to potential class members will be controlled or could be distorted; (3) whether communication will be disruptive; and (4) whether communication will be intrusive upon privacy." *Ott v. Publix Super Mkts.*, 298 F.R.D. 550, 555 (M.D. Tenn. 2014); *see also Garcia v. TWC Admin.*, LLC, No. SA:14-CV-985-DAE, 2015 U.S. Dist. LEXIS 50384, at *10-13 & n.2 (W.D. Tex. April 16, 2015).

### III. SUMMARY OF ARGUMENT

Plaintiffs have failed to meet their burden of demonstrating that Defendant's Servers, Bartenders and Gauchos are "similarly situated" within the meaning of prevailing law. Plaintiffs' evidence clearly demonstrates the disparities, not the similarities, between their experiences, and the very nature of Plaintiffs' allegations demonstrate that any proposed collective action would degenerate into many individualized mini-trials related to alleged bases for liability and related damages. As a result, and in light of the goals of collective actions identified by *Swales*, Plaintiffs' effort to proceed as a collective action must fail.

Even if the Court were to find that some of Defendant's employees might be able to proceed as a collective action, notice would be inappropriate to all of the Servers, Bartenders and Gauchos. Notice to all such employees would only stir up litigation, which is prohibited by Supreme Court and Fifth Circuit precedent, and would potentially result in inefficient, individualized mini-trials prohibited by the collective action provisions of the FLSA.

Finally, if the Court determines that notice to some group of Defendant's employees is appropriate, Defendant should not be required to provide all of the information sought by Plaintiffs, and Plaintiffs' should not be permitted to engage in all of the forms of notification

requested, as such requested information is personal and private, and Plaintiffs' proposed forms of notice are unnecessary and intrusive.

### IV. PLAINTIFFS HAVE NOT DEMONSTRATED THAT THERE ARE SIMILARLY SITUATED INDIVIDUALS WHO MAY PARTICIPATE IN THIS CAUSE.

Plaintiffs' Motion and allegation of "similarly situated" individuals is premised upon "Defendant's common policy of:  - Requiring the Servers, Bartenders, and Gauchos ("Tipped Employees") to pay for comps, mis-orders, and walkouts; - Participating in a tip pool with non-tipped employees (CSR); Not having proper tip notice; and – Not paying the employees time and one half for all hours worked over forty (40) in a workweek."  (Pl.'s Mot. [Dkt # 45] at 5).  Plaintiff erroneously contents that "the merits of Plaintiffs' claims and Defendant's defenses are largely irrelevant" and incorrectly, and repeatedly, references "conditional certification" of a proposed collective action.  *Id*. at 5-6.  *Swales* specifically recognized that the conditional certification process, *a la Lusardi*, found no support in the provisions of the FLSA and is inappropriate.  *See supra* at 6-7.  *Swales* also specifically recognized that the district court's evaluation of the merits of the case and all of the available evidence is helpful in fulfilling the district court's required role of determining whether individuals are similarly situated and whether notice should be issued, repeatedly cautioning that district courts must observe the Supreme Court's directive in *Hoffman La Roche* not to signal approval of the merits or stir up litigation.  *See supra* at 8-9.

### A. Employees Were Provided the Required Tip Credit Notice.

Although the FLSA generally requires employers to pay employees the statutory minimum wage — currently $7.25 per hour, *see* 29 U.S.C. § 206(a)(1)(C), the FLSA permits employers to pay "tipped employees" an amount as little as $2.13 per hour, with the tipped employees' tips validly constituting the balance up to the amount of the minimum wage.  *See* 29 U.S.C. §  203(m).  This discounted hourly rate is typically referred to as the "tip credit."  *See id*.; *Montano v. Montrose*

11

*Rest. Assocs., Inc*., 800 F.3d 186, 188 (5th Cir. 2015). The FLSA provides, however, that the tip credit provisions "shall not apply with respect to any tipped employee unless such employee has been informed by the employer of the provisions of this subsection, and all tips received by such employee have been retained by the employee, except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips." 29 U.S.C. § 203(m)(2)(A)(ii). "[A]n employer need not explain the tip credit in detail to its employees." *Gustavus v. Cazos, Inc*., 774 F. Supp. 2d 856, 858 (S.D. Tex. 2011) (*citing Kilgore v. Outback Steakhouse of Florida, Inc*., 160 F.3d 294, 298 (6th Cir. 1998); *Pedigo v. Austin Rumba, Inc*., 722 F. Supp. 2d 714, 725 (W.D. Tex. 2010); *Bernal v. Vankar Enterprises, Inc*., 579 F. Supp. 2d 804, 809 (W.D. Tex. 2008); *Lentz v. Spanky's Restaurant II, Inc*., 491 F. Supp. 2d 663, 672 (N.D. Tex. 2007)). As recognized by the Department of Labor in connection with its proposed revisions to the FLSA's tip-related regulations in 2008, "[a]lthough written notice is frequently provided, it is not required to satisfy the employer's notice burden." "Updating Regulations Issued Under the Fair Labor Standards Act," 73 Fed. Reg. 43654, 43659 (July 28, 2008) (*comparing Kilgore v. Outback Steakhouse of Fla., Inc*. 160 F.3d 294, 299 (6th Cir. 1998) *with Pellon v. Business Rep. Int'l, Inc*., 528 F. Supp. 2d 1306, 1310-11 (S.D. Fla. 2007)). "However [the employer] must at a minimum inform the employees that 'it intends to treat tips as satisfying part of the employer's minimum wage obligation.'" *Gustavus*, 774 F. Supp.2d at 858 (*citing Kilgore*, 160 F.3d at 298; *Martin v. Tango's Restaurant, Inc*., 969 F.2d 1319, 1322 (1st Cir. 1992)); *Pedigo*, 722 F. Supp. 2d at 725; *Bernal*, 579 F. Supp. 2d at 809; *Lentz*, 491 F. Supp. 2d at 672-73).

Here, at the time that Plaintiff Cortez was hired, Defendant provided verbal notice to employees as to whom a tip credit was claimed during orientation. (*See* Decl. of Jarbas Gottardo, attached hereto and incorporated herein by reference as Ex. A, at 1). More specifically, Plaintiff

Nathaly Cortez was informed of the tip credit and her required participation in the tip pool by Defendant's General Manager, Mr. Jarbas Gottardo. *See id*. In her deposition, Plaintiff did not deny this, although she claimed that she did not *remember* such a conversation with Mr. Gottardo. (*See* Dep. Of Nathaly Cortez, attached hereto and incorporated herein by reference as Ex. B, at 72). Of course, her failure to remember such a conversation does not serve as evidence that it did not take place, in the face of Mr. Gottardo's sworn testimony. *See, e.g., Guillory v. PFB Mgmt., LP*, No. H-11-4377, 2013 U.S. Dist. LEXIS 39484, at *15 (Feb. 27, 2013 (finding that no recollection of notice of tip credit does not contradict summary judgment evidence of such notice). Likewise, she does not deny that she was verbally notified of these matters in her Declaration. (*See* Pls.' Ex. 1 [Dkt # 45-2]). Instead, she merely alleges that she did not receive the Notice to Tipped Employees[3] or Tip Pooling Agreement that Defendant implemented following her termination, while acknowledging that she signed the Tip Pool Agreement. *See id*. at 5[4] (Paras. 25-27, referencing Pls.' Exs. 1E, 1F and 1G).

---

[3] Plaintiffs assert that "Casa's Tipped Pooling Agreement and Notice to Tip Employees, and Tip Reporting Acknowledgments do not comply with the requirement of the FLSA," (Pls.' Mot. at 17), but Plaintiffs fail to support such bare statement with any argument or authority. Review of the "Notice of Tipped Employees" (*see* Pls.' Ex. 1F [Dkt # 45-8]) clearly reveals (tracking the requirements identified in Plaintiffs' Motion) that the receiving employee is notified that he/she is a "tipped employee," that he/she will "receive a cash wage of at least $2.13 per hour," that they will be paid "at least minimum wage" but that Defendant "will claim up to $5.12 as a tip credit for every hour you work," that "[t]he tip credit taken . . . cannot be greater than the value of tips you receive" and that Defendant will pay any difference between the minimum wage and the sum of the hourly wage and tips actually received, that the employee will participate in a tip pool with others "who customarily and regularly receive tips," that, again, "if the amount of tips you receive from the tip pool is not sufficient to cover the tip credit, Casa Do Brasil will make up the difference," and that "this agreement will not apply to any employee not informed of the requirements set forth in the Fair Labor Standards Act's regulations . . . ."

[4] In providing pinpoint cites to pages of Plaintiffs' exhibits, Defendant cites herein to the page number identified in the top right corner of each exhibit. For example, then, the page cited here is identified as "Page 5 of 9" in the top right corner, although it is actually identified at the bottom of that page as page 4 of the Declaration. This has been done in the hope of minimizing confusion,

Defendant has presented evidence that it verbally instructed tipped employees regarding the tip credit and tip pool (*see* Ex. A at 1-2) and that it also provided Plaintiff Cortez and other tipped employees with the initial form of "Tip Pooling Agreement," from the restaurant's opening on May 1, 2018, until July, 2021, when it then required tipped employees to sign the "Notice to Tipped Employees," the "Tip-Pooling Agreement" and "Tip Reporting Acknowledgment." (*See* Ex. A 1-2 (explaining verbal and initial Tip Pooling Agreement notices, as well as subsequent written notices); *see also* Depo. Of Corp. Rep. Jarbas Gottardo, attached hereto and incorporated herein by reference as Ex. C, at 74-75)). In the face of this evidence, the Opt-Ins fail to present any evidence to support a claim that they were not informed of the tip credit or tip pool. Opt-In Candiani asserts simply that "Casa did not have any posters or signs up about how we would be paid minimum wage or tips" (Decl. of Mario Candiani, attached to Pls.' Mot. As Ex. 2 [Dkt # 45-11], at 4 (Para. 14)), and Opt-In Felan completely fails to address the issue of notice or lack thereof. (*See* Decl. of Joseph Felan, attached to Pls.' Mot. As Ex. 3 [Dkt # 45-12]). Importantly, Plaintiffs failed to inform the Court that Opt-In Candiani signed the "Notice to Tipped Employees," the "Tip Reporting Acknowledgment" and the "Tip-Pooling Agreement," all of which provide the required notice to employees regarding the tip credit. (*See* Exs. D-1, D-2 and D-3, respectively; *see also* Dec. of Raquel Belnap, attached hereto and incorporated herein by reference as Ex. D, at 1 (authenticating documents as business records)).

As made clear in *Swales* (*see supra* at 3 n.1), Plaintiffs bear the burden to show that others are similarly situated. Here, the evidence establishes exactly the opposite. Of the three Plaintiffs claiming that others are similarly situated: (1) Plaintiff Cortez was given verbal notice, which she

---

given that depositions are not included in their entirety and that other exhibits utilized may have other page numbers otherwise marked on the exhibit.

cannot dispute; (2) Opt-In Felan does not dispute Defendant's evidence of verbal notice and provides no evidence, at all, related to notice or lack thereof; and (3) Opt-In Candiani falsely states that he received no notice, when the evidence establishes that he clearly did. The dissimilarity in the experiences of the three plaintiffs thus far, in fact, proves that there are no similarly situated individuals with respect to the issue of notice, except to the extent that the evidence demonstrates that the required notice was actually provided. Plaintiffs have failed to meet their burden, and Plaintiffs' Motion must be denied.

### B. Credit Card Tips Were Not Kept by Defendant.

Without any evidence related to anyone else,[5] Plaintiffs next claim that Plaintiff Cortez' credit card tip records allegedly "show[ ] that the defendant shorted her on her credit card tips on her paychecks." (Pls.' Mot. at 17). In support of this allegation, Plaintiffs refer to a column in the "Employee Timecard" labeled "Non-Cash Tips" (*see* Pls.' Ex. 1A [Dkt # 45-3]) and correctly point out that the amounts identified in that column do not total the amount of credit card tips identified in the "Non Cash Share" column of a report from a separate program (*see* Pls.' Ex. 1B [Dkt # 45-4]) that calculated the credit card tips owed to Plaintiff Cortez. Plaintiffs' "evidence" completely fails to support their allegations for many reasons, based primarily on Plaintiffs' failure to understand, or refusal to convey to the Court, the differences between the two reports provided as exhibits.

Despite having taken Defendant's corporate representative deposition, and having identified as topics for such deposition Defendant's "record-keeping practices," "[e]mployment records," "[h]ow tips and compensation are calculated and paid . . . ," "[h]ow sales and tips are

---

[5] Defendant produced to Plaintiffs the anonymized data related to thirteen (13) additional tipped employees. Despite her burden to show that others are similarly situated, Plaintiffs failed to present *any* evidence from such other individuals in support of this argument.

recorded . . . ," and "[r]ecord keeping for payroll and time records . . . ," (*see* Pl.'s Third Amend. Fed. R. Civ. P. 30(B)(6) Depo. Notice, attached hereto as Ex. E, at 7 (Exhibit A thereto, identifying topics for deposition)), Plaintiffs completely to provide any testimony from such deposition related to these issues.  Plaintiffs were required to record their hours worked through the POS system. (*See* Ex. A at 3-4).  Plaintiffs were also required to participate in a tip pool, which aggregated tips received during a given shift and then divided those tips among the tipped employees on that shift. *See id*. at 1-2.  The POS system in which Plaintiffs recorded their hours worked was also the system used by employees to record customer orders, customer bills related to such orders and customer payments, including tips.  (*See id*. at 4 (Para. 17) *see also* Ex. C at 35-36; Ex. D at 1).  Although the POS system can identify the amount of a credit card tip left by a customer when customer's payment was recorded in the POS system, the POS system does not calculate the credit card tips that were to be paid to each tipped employee as a result of the tip pool.  (*See* Ex. A at 4 (Para. 17); Ex. D at 1-2 (Paras. 4-5); Ex. C at 36-37).  Such tips were calculated by different software systems, which imported the credit card tip data from the POS system and calculated the tips owed to each tipped employee working on the shift at issue based on the tip pool formula identified to tipped employees.  (*See* Ex. A at 4 (Para. 17); Ex. D at 1-2 (Paras. 5 and 6); Ex. C at 36-37).[6]  The result of such calculations are then input into the payroll system, for payment to the employee.  (*See* Ex. A at 4 (Para. 17); Ex. D at 1-2 (Para. 5)).  It is for these reasons that the amounts of the "Non-Cash Tips" reflected on the POS "Employee Timecard" are not the same as the "Non Cash Share" of

---

[6] Defendant has used three (3) different systems to calculate tips owed to tipped employees:  (1) Interconnect, from May 1, 2018, until October, 2020; (2) Suntek, from the end of October, 2020, through June or July, 2021; and (3) Gratuity Solutions, from July, 2021, through the present.  (*See* Ex. A at 4; Ex. D at 1-2; Ex. C at 40-41).

credit card tips that are identified on the report generated by the software system that calculated credit card tips owed pursuant to the tip pool.  (*See* Ex. A at 4 (Para. 18); Ex. D at 2 (Para. 7)).

Far from demonstrating that credit card tips were taken from Plaintiff Cortez (and not any others) by Defendant, Plaintiffs' arguments and "evidence" related to this issue simply demonstrate an obvious failure to understand what was presented to them through written discovery and explained to them during the corporate representative deposition.  Such unfounded argument of theft of credit card tips by Defendant does not support an argument that employees are similarly situated, this argument must fail and Plaintiffs' Motion must be denied.

**C. Deductions From Cash Tips Were Uncommon, and Plaintiffs Cannot Show That All Servers, Bartenders and Gauchos Were Impacted.**

Defendant required that cash tips collected from customers be placed in a cash box, so that they could be divided at the end of the shift pursuant to the tip pool by a representative of the Servers and Gauchos.  (*See* Ex. B at 73-76; Decl. of Cameron Rogneby, attached hereto and incorporated herein by reference as Ex. F, at 3 (Para. 13)).  Plaintiffs allege that cash was taken from the cash tips that were distributed to Servers, Bartenders, Gauchos and CSRs for various reasons.  (*See* Pls.' Mot. at 8-9).  Plaintiff is correct that Defendant has acknowledged that it took deductions from the cash tip box on a very limited number of occasions.  *See id*.  Plaintiffs claim that such deductions occurred more frequently, but they have failed to present any competent evidence that such deductions were taken regularly.  (*See* Pls.' Ex. 1 [Dkt # 45-2] at 4 (Paras. 18-22, identifying only a few alleged instances); Pls.' Ex. 2 [Dkt # 45-11] at 2-3 (Para. 5, identifying only two alleged instances); Pls.' Ex. 3 [Dkt # 45-12] at 3 (Para. 10, describing an alleged statement that this *could* happen, but failing to identify any specific instances in which it did).  Similarly, when questioned during her deposition, Plaintiff Nathaly Cortez could only identify a few limited

instances in which cash was allegedly removed from the cash tips, which instances totaled less than $200 of allegedly removed cash tips. (*See* Ex. B at 86-89 and 98-102).

Again, for this Court to provide notice to all Servers, Bartenders and Gauchos as requested, Plaintiffs bear the burden of demonstrating that all such employees are similarly situated. Plaintiffs have provided no evidence, other than their vague, unsupported statements of a limited number of instances in which cash was allegedly removed from the cash tips to pay for employee mistakes. Even assuming, *arguendo*, that such allegations were true, such limited instances cannot justify notice to all Servers, Bartenders and Gauchos on all shifts over a period of more than three (3) years. At best, based on the "evidence" presented in Plaintiff Cortez' deposition, she <u>might</u> be able to prove that, for example, an additional $55 should have been divided up pursuant to the tip pool among all of the other tipped employees on a given shift at issue, which shift Plaintiffs cannot identify.[7] Any such "evidence" would necessitate fact-intensive discovery and then mini trials with respect to each such limited example to try to determine (1) the small amount at issue; (2) the shift on which it allegedly took place; (3) the tipped employees who worked on that shift and, thus, would be entitled to a portion of the allegedly removed cash; (4) the amount that would have been additionally distributed to the tipped employees on that shift; (5) the number of potential plaintiffs who may have worked on such shifts; and (6) the resulting amount, after dividing the allegedly removed amount among all employees on that shift (whether they opted in as plaintiffs or not), to be paid to opt-in plaintiffs as damages. Clearly, Plaintiffs have failed to meet their burden of establishing that all Servers, Bartenders and Gauchos were working any of the shifts when such limited instances took place and, as a result, they have failed to meet their burden of showing that

---

[7] $55 is the largest of the amounts identified by Plaintiff Cortez as allegedly taken from the cash box on the few alleged instances that she identified. (*See* Ex. B at 87).

all such individuals are similarly situated. Based on this obvious failure, this Court cannot find that the intensely fact-specific evidentiary proofs required to determine damages at a potential trial are proper under the collective action provisions of the FLSA, which were included so as to make the determination of alleged violations and damages more efficient – not more cumbersome and confusing.

## D. CSRs Were Not Improperly Included in the Tip Pool.

Without any competent evidence of the actual authority of CSRs, Plaintiffs argue that CSRs were managers whose participation in the required tip pool violated the FLSA's provisions related to the distribution of tips to tipped employees. (*See* Pls.' Mot. at 9-13). Generally citing the Department of Labor's ("DOL") revisions[8] to portions of the regulations related to tipped employees, Plaintiffs argue that "Employers are not permitted to keep employees' tips for any reason. This prohibition also extends to the employer's managers and supervisors." *Id*. at 14. Of relevance to the current matter, the regulation now provides that "[f]or purposes of section 3(m)(2)(B), the term 'manager' or 'supervisor' shall mean any employee whose duties match those

---

[8] As acknowledged by Plaintiffs (*see* Pls.' Mot. at 14), the regulation cited in their Motion did not go into effect until November 23, 2021. *See* "Tip Regulations Under the Fair Labor Standards Act (FLSA); Partial Withdrawal," 86 Fed. Reg. 52973 (September 24, 2021). This effective date was six (6) months *after* Plaintiff Cortez' employment with Defendant terminated (*see* Pls.' Ex. 1 [Dkt # 45-2] at 2 (Para. 2, explaining dates of employment ad 6/2019-10/2019 and 11/2020-5/2021)), but would have included part of the Opt-In Plaintiffs' respective employments. (*See* Pls.' Ex. 2 [Dkt # 45-11] at 2 (Para. 3); Pls.' Ex. 3 [Dkt # 45-12] at 2 (Para. 2)). The regulation in effect at the time Plaintiff Cortez began employment included no such provisions related to managers and supervisors. *See* 32 Fed. Reg. 13575, 13580 (September 28, 1967) (29 C.F.R. § 531.52 and 531.54). However, the provisions related to managers and supervisors were added to the regulations effective March 1, 2021. *See* 85 Fed. Reg. 86756, 86789-90 (December 30, 2020) (revising 29 C.F.R. §§ 531.52(b)(2) and 29 C.F.R. § 531.54(c)(3)). The regulations were only minimally changed in the more recent revision by adding "and solely" to 29 C.F.R. § 531.52(b)(2) and changing "participate in" to "receive tips from" and changing "in the pool" to "to receive tips from the tip pool" to 29 C.F.R. § 531.52(c)(3). *Compare* 85 Fed. Reg. at 86789-90 *to* 86 Fed. Reg. at 52986.

of an executive employee as described in § 541.100(a)(2) through (4) or § 541.101 of this chapter."

29 C.F.R. § 531.52(b)(2). Further, and with respect to tip pooling, the regulation similarly provides

that managers and supervisors may not receive tips from a tip pool. *See* 29 C.F.R. § 531.54(c)(3).[9]

### 1. Claims Regarding Payment of a Salary to CSRs Are Incorrect and Irrelevant.

Of the four (4) requirements for the FLSA's executive exemption identified in the DOL's

regulations, the DOL excluded the requirement that an executive be paid a salary,[10] choosing to

reference only "§ 541.100(a)(2) through (4)."[11] Ignoring that this element was excluded,

Plaintiffs' allege that CSRs were paid a "salary," thereby suggesting that they are managers

prohibited from receiving tips. (*See* Pls.' Mot. at 10). Not only did Plaintiffs fail to acknowledge

that the method of payment is not included among the elements of relevance to the issue that they

have chosen to raise,[12] but Plaintiffs have ignored the fact that the payment of a salary is neither

prohibited nor demonstrates that the recipient is a member of management. *See, e.g.*, 29 C.F.R. §

778.113 (providing guidance as to how to calculate a non-exempt employee's regular rate for

---

[9] *See supra* at 14 n.8 regarding revisions from the regulation effective March 1, 2021, to the regulation effective November 23, 2021.

[10] *See* 29 C.F.R. § 541.100(a)(1).

[11] The revised tip regulation also cites "§ 541.101," which "includes any employee who owns at least a bona fide 20-percent equity interest in the enterprise in which the employee is employed . . . ." Plaintiffs have made no claim or showing that CSRs meet this provision as a business owner.

[12] The ridiculousness of Plaintiffs' argument regarding the alleged payment of a salary to CSRs is also shown by the fact that payment of a salary to executive employees who would otherwise meet the other requirements of the FLSA's executive exemption (which Plaintiffs contend are satisfied here) results in an exemption from the minimum wage and overtime requirements of the FLSA. *See, e.g.,* 29 U.S.C. § 213(a)(1); 29 C.F.R. § 541.100(a) (identifying requirements for satisfying FLSA's executive exemption). The CSR paystubs produced by Plaintiffs in support of their Motion, however, demonstrate clearly that <u>overtime was paid</u>. (*See, e.g*., Pls.' Exs. 19, 20 and 21). To suggest that Defendant willfully violated the FLSA by failing to pay Plaintiffs overtime, while at the same time suggesting that Defendant voluntarily paid overtime to CSRs who (if Plaintiffs are correct) exempt from the FLSA's overtime requirement, is nonsensical.

purposes of complying with FLSA's minimum wage and overtime requirements for non-exempt employees who are paid a salary).

Despite the irrelevance of Plaintiffs' arguments with respect to the manner in which CSRs were paid, the fact is that *CSRs were paid by the hour*, although Defendant guaranteed them that their hourly rate of pay – inclusive of the hourly rate and credit card tips – would not be less than a given amount, typically $20 per hour.  (*See* Ex. A at 2 (Para. 8); Pls. Ex. 6 [Dkt # 45-15] at 62 and 64; *see also* Ex. F at 2 (Para. 7)).  Plaintiff neglects to inform the Court that *she was promised a similar guarantee*, the additional payment for which also appeared on her pay stubs as "Misc Earnings" (*see* Ex. B at 80-81 and 234-39; *see also* Pls.' Ex. 1C [Dkt # 45-5]; Ex. A at 2-3 (Para. 10))[13] and that she is unaware of whether CSRs were also paid using a similar guarantee.  (Ex. B at 122-23).  Plaintiffs' allegations that CSRs are paid a salary are both patently false and completely irrelevant.

### 2. CSRs Do Not Manage the Enterprise or a Department Thereof.

With respect to issues that are of relevance here -- the elements that the DOL included in its definition of managers and supervisors excluded from receiving tips[14] -- the first element requires that the CSR's "primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof."  29 C.F.R. § 541.100(a)(2).  Without even referencing this element, Plaintiffs claim that "CSRs managed the

---

[13] Other Servers, Bartenders and Gauchos, while paid an hourly rate, are also often guaranteed a minimum hourly rate, and Defendant often pays additional amounts to such employees when their hourly rates and credit card tips during a pay period do not equal or exceed the guaranteed minimum amount.  (*See* Ex. A at 2-3 (Paras. 8-12)).

[14] Technically, managers and supervisors are not precluded from keep all tips, as they may keep those tips "that he or she receives directly from customers based on the service that he or she directly and solely provides," 29 C.F.R. § 531.52(b)(2), but they are prevented from receiving any of the employees' tips and from participating in the tip pool.  *See id*.; 29 C.F.R. § 531.52(c)(3).

restaurant," (Pls.' Mot. at 11), "wore manager uniforms," *id*. at 12, "had different job duties than bartenders, servers, and gauchos," *id*., "had management experience," *id*., and listed CSRs as managers in a "Server's Training Manual." *Id*. at 12-13.

The starting point for evaluation of this issue should be the job description for the Customer Service Representative. (*See* Pls.' Ex. 4 [Dkt # 45-13]). Nowhere in this job description does it suggest, much less prove, that the primary duty of a CSR is management of Defendant's restaurant or a department thereof. The Declarations of Plaintiff Cortez and Opt-In Candiani provide mere speculation as to CSRs' management authority based on their alleged observations of CSRs, without any indication that either of them ever served as a CSR.[15] Plaintiffs also reference the deposition of Mr. Rogneby, but the pages cited merely reflect that he would report matters to management for possible action, not that he had authority to take action. (*See* Pls.' Mot at 11 (*citing* Pls.' Ex. 5 [Dkt # 45-14] at 5-6)).[16]

Even if true, Plaintiffs' contention that CSRs wore "manager uniforms" is of no relevance here. Nowhere in the first element of the test adopted by the DOL is there any reference to the attire of any employee with respect to their authority to manage the enterprise. Plaintiffs' assertion that CSRs "had different job duties" than the other tipped employees is both incorrect and fails to prove that the CSRs' primary function is the management of Defendant's business. As made clear by the CSR job description (*see* Pls.' Ex. 4 [Dkt # 45-13]), Mr. Rogneby's prior deposition testimony (*see, e.g*., Pls.' Ex. 5 [Dkt # 45-14] at 21 (testifying that a CSR "perform[s] almost the same exact duties as a server would. Or they open tables. They take orders. They bring drinks to

---

[15] *See* Defendant's Motion to Strike, filed contemporaneously with this Response, at 1-2, 11 (objecting to the Declarations and moving that they be stricken and given no evidentiary consideration).

[16] Defendant's counsel timely asserted an objection to the question at the bottom of page 16 and top of page 17 of Mr. Rogneby's deposition. Defendant asks that such objection be sustained.

the table. They go to the back and grab waters. They grab bread, side dishes. They walk around

to multiple tables, talking to the guests making sure they are happy. . . . They do the same as a

server just with a little bit more responsibility.") and the Declarations of Mr. Gottardo and Mr.

Rogneby, the primary duty of a CSR is to participate as a member of the client service team –

along with Servers, Bartenders and Gauchos – in serving customers. (*See* Ex. A at 2 (Para. 7); Ex.

F at 1-2 (Para. 6)). That their duties may, in some way, be different, does not establish that their

primary duty is management.

Plaintiffs' reference to prior management experience (*see* Pls.' Mot. at 12) also fails here.

The fact that a CSR had such experience, or even that such experience was preferred or required

by Defendant, is of no relevance to Plaintiffs' required proof that CSRs have as their primary duty

the management of Defendant's business. Likewise, the fact that Defendant's current Server's

Training Manual lists two prior CSRs – Jocemar Suzin and Cameron Rogneby – as "Managers"

(*see* Pls.' Mot. at 12-13 (citing Pls.' Ex. 16 [Dkt # 45-25] at 3) fails to meet Plaintiffs' burden of

proof here for the simple reason that both Mr. Suzin and Mr. Rogneby, while having been

previously employed by Defendant as CSRs, were employed by Defendant as Managers *at the

time that the Servers Training Manual was revised and distributed approximately five months ago*.

(*See* Ex. A at 4 (Para. 19); Ex. F at 3 (Para. 16); *see also* Pls.' Ex. 6 [Dkt # 45-15] at 11-12 (Mr

Gottardo's testimony identifying Mr. Suzin and Mr. Rogneby as current Assistant Managers)).

Most importantly with respect to this issue, Defendant's evidence clearly establishes that

CSRs' primary duty is not the management of Defendant's restaurant or a department thereof. The

Declarations of Mr. Gottardo and Mr. Rogneby prove that CSRs have no management authority,

although they may assist with certain functions if requested and authorized by a manager. (*See*

Ex. A at 2-3 (Paras. 7 and 13); Ex. F at 1-3 (Paras. 6, 11 and 12)). Plaintiffs have presented nothing

but their own unsubstantiated statements that CSRs perform some tasks that they believe are management-like.  Even if such statements could constitute evidence, they cannot support a finding by this Court that CSRs' primary duty is the management of Defendant's restaurant or a department thereof.  Because Plaintiffs cannot prove that the first element of the DOL's definition of a manager or supervisor has been met by CSRs, their claim that CSRs improperly received tips must fail, there can be no finding that others are similarly situated, and their Motion must be denied.

**3.  CSRs Do Not Direct the Work of Two or More Employees.**

The second element of relevance to whether a CRS is a manager or supervisor excluded from receiving tips requires that the CSR "customarily and regularly directs the work of two or more other employees."  29 C.F.R. § 541.100(a)(3).  Here, relying upon only their own Declarations, Plaintiffs make the conclusory statement that "[s]ince the CSRs were assigned to supervise and manage areas of the restaurant, they were in charge of directing multiple servers, bartenders, and Gauchos at a time."  (Pls.' Mot. at 11).  Plaintiffs' unsupported statements regarding their beliefs of the supervisory authority of CSRs are incompetent as evidence.  The only competent evidence related to this issue clearly demonstrates that CSRs do not have any authority to direct the work of two or more employees.  (*See* Ex. A at 3 (Pars. 13); Ex. F at 2-3 (Paras. 11 and 12)).  At most, CSRs relay instructions from a manager to other employee; they do not have the authority to direct such employees.  *See id*.  Because Plaintiffs have failed to present any competent evidence that CSRs supervise two or more employees, they have failed to meet their burden of demonstrating that others are similarly situated because of the inclusion of CSRs in the tip pool, and their Motion must be denied.

24

**4.   CSRs Do Not Have Authority to Hire or Fire Employees.**

The third and final element of relevance to whether a CRS is a manager or supervisor and prohibited from receiving tips requires that the CSR "ha[ve] the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." 29 C.F.R. § 541.100(a)(4).  Although Plaintiffs claim that CSRs "had the right to recommend the hiring or firing of other employees," (Pls.' Mot. at 11), the evidence cited does not support such an assertion. The Declarations of Plaintiff Cortez and Opt-In Candiani provide mere speculation regarding their alleged observations of CSRs, without any assertion that either of them ever served as a CSR.[17] More importantly, the citation to the deposition of Mr. Rogneby does not support Plaintiffs' allegation, as Mr. Rogneby testified that his role as a CSR was merely to <u>report</u> information to a manager (*see* Pls.' Ex. 5 [Dkt # 45-14] at 6-7)[18] and that a manager *might* ask his opinion regarding whether a new server passed the server training test.  *See id*. at 7.  Plaintiffs' citation to Mr. Gottardo's testimony, while at least somewhat accurate,[19] fails to demonstrate that a CSR's statement to a manager that a server completed training qualifies as a responsibility of management, as the testimony that immediately follows clarifies that such confirmation to a

---

[17] *See* Defendant's Motion to Strike at 1-2, 11 (objecting to the Declarations and moving that they be stricken and given no evidentiary consideration).

[18] In response to the question posed by Plaintiffs' counsel at the bottom of page 17 of Mr. Rogneby's deposition, Defendant's counsel timely asserted an objection.  (*See* Pls.'s Ex. 5 at 6-7). Defendant asks that such objection be sustained.

[19] Plaintiffs fail to acknowledge Mr. Gottardo's testimony immediately following the question and answer cited, in which Mr. Gottardo made clear that "[t]here is always a manager that certifies a new server, along with a server trainer that on multiple server trainers to help them in their training."  (*See* Pls. Ex. 6 [Dkt # 45-15] at 93).

manager of a server's completion of training is provided by whoever was training the new server, whether a CSR or other server. (*See* Pls.' Ex. 6 [Dkt # 45-15] at 92-93).

Nowhere do Plaintiffs cite any authority that would support a finding that a CSRs statements to a manager regarding a new server's completion of training qualifies a CSR as management, and if Plaintiffs' contentions that CSRs are managers were true, there would clearly be no need for such "certification" to a manager. More importantly, the only competent evidence presented on this issue clearly reflects that CSRs do not have the authority to hire or fire employees, or otherwise make recommendations or suggestions that are given weight by Managers. (*See* Ex. A at 3 (Para. 13); Ex. F at 2-3 (Paras. 11 and 12)).   This effort, like Plaintiffs' other efforts, must fail.

### 5. Plaintiffs Failed to Prove that CSRs Meet the DOL's Definition of Managers or Supervisors.

A simple review of the executive employee test adopted by the DOL for use in determining who is a manager or supervisor for purposes of the relevant tipped employee regulations reveals that the three elements are stated in the conjunctive, thereby requiring that all three of the elements be satisfied. *See* 29 C.F.R. § 541.100(a)(2) – (4) (stating "and" at the end of (a)(3)).   For the reasons identified herein, Plaintiffs cannot establish that any one of the three elements are satisfied, much less that all three have been satisfied.   Because Plaintiffs have failed to carry their burden of establishing that other Servers, Bartenders and Gauchos are similarly situated by virtue of the CSR's inclusion in the tip pool, their Motion must be denied.

### E. Edits to Time Records Demonstrate that Employees Are Not Similarly Situated.

Defendant complies with its FLSA-mandated obligation to accurately record non-exempt employees' hours worked through the Point of Sales ("POS") system. (*See* Ex. A at 3-4 (Para. 15)).   Where the time recorded in the POS system is incorrect, such as when an employee failed

to "clock in" to record the start time or "clock out" to record the ending time, Managers have the ability to make changes to the recorded time, all of which changes are recorded on a time audit report. (*See id*. at 2-3 (Paras. 15-16); *see also* Ex. F at 3 (Para. 15)). Although Defendant's restaurant does not have an official time when the restaurant is closed, Defendant typically stops seating customers at 9:30 pm, and the restaurant remains open until all customers have left and closing duties have been performed. (*See* Ex. A at 3-4 (Paras. 15-16); Ex. F at 3 (Para. 15)). Typically, the restaurant is closed by or before 11:30 pm, although the time varies because of the factors mentioned. *See id*.. Where an employee fails to record her end time at the end of her shift, the POS system automatically records the end time as 4:00 a.m. on the following day, which time record must then be changed by a Manager to reflect the time at which the employee stopped working, and such change is, again, recorded on the time audit report. (*See* Ex. A at 3 (Para. 14); Ex. F at 3 (Para. 14)).

In support of their position that Servers, Bartenders and Gauchos are similarly situated, Plaintiffs reference Defendant's time audit reports that reflect all changes made to employee time entries. More specifically, Plaintiffs include as Exhibit 1D Plaintiff Nathaly Cortez' time audit reports. Plaintiff Nathaly Cortez contends in her Declaration that all such changes were improper (*see* Pls.' Ex. 1 [Dkt # 45-2] at 3-4), but she fails to even recognize any of the obvious instances clearly identified on Exhibit 1D in which she failed to record her end time, requiring that a Manager change the end time to accurately reflect her hours worked. (*See, e.g.,* Ex. 1D [Dkt 45-6] at 4-8 (reflecting changed "Original Value" "EndTime" of 4:00 AM on 6/21/19, 7/23/19, 8/19/19, 12/10/20, 2/21/21, 3/5/21, 4/14/21, 4/17/21, 4/21/21, 4/24/21, 5/9/21 and 5/21/21)). Without presenting any supporting evidence, Opt-In Candiani alleges only that "I think managers and CSRs edited my time." (Pl.'s Ex. 2 [Dkt # 45-11] at 4 (Para. 12)). More importantly, and demonstrating

that employees are <u>not</u> similarly situated, Opt-In Felan <u>fails to include any allegation</u> of allegedly improper changes to his time record.  (*See* Pls.' Ex. 3 [Dkt # 45-12]).  Finally, it should be noted that, pursuant to this Court's suggestion of March 23, 2022,[20] and the Parties' subsequent agreement,[21] Defendant provided anonymized time audit reports for thirteen (13) individuals – 1 Bartender, 2 Gauchos and 10 Servers.  Despite insisting that such discovery was necessary to prove their claims,[22] <u>Plaintiffs cited none of these produced time audit records</u> in support of their bare allegations that Defendant changed employee time records to minimize overtime payments.  A simple review of the reports produced reflects a variety of changes, ranging from corrections in incorrect job class as a "Server" when the individual should have clocked in as "Server Non-Tipped" or "Training" (so as to be paid $7.25 per hour while performing non-tipped work, resulting in a HIGHER hourly rate being paid), corrections to the beginning time when they forgot to clock in (thereby ADDING time to their time record for the week), corrections of obvious instances in which employees forgot to record their end time (thereby resulting in the POS system identifying an "EndTime" of 4:00 AM), and other changes where individuals forgot to clock in and out for breaks.[23]

　　　　To prevail on their Motion, Plaintiffs must prove that the Servers, Bartenders and Gauchos to whom they request notice of this suit are similarly situated with respect to changes in their

---

[20] *See* Minute Entry of hearing of 3/23/22.

[21] *See* Joint Rule 29 Stipulation Regarding Discovery [Dkt # 29] (the "Discovery Stipulation") at 5-6 (Para. 7F).

[22] *See, e.g.*, Pl.'s Mot. Compel [Dkt # 15] at 4 ("Plaintiff's discovery will allow the Court to make an informed decision as to whether to certify this case as a collective action.").

[23] *See* time audit reports produced by Defendant, attached hereto and incorporated herein by reference as Ex. G.  Because the time audit reports were included in a larger production of timecards, time audit reports and paystubs, grouped for each of the anonymized individuals selected as provided in the Discovery Stipulation, the Bates labels are not consecutive, but all such time audit reports are included in Defendant's Ex. G.

respective time records.  In support of their Motion, they have provided only a time audit report reflecting a few changes to Plaintiff Nathaly Cortez' time record from the period of time from 2019 through 2021, with many of those related to instances in which the POS system clocked her out at 4:00 am because of her failure to properly record her end time.  Her allegations, essentially, that not all of the time record changes identified on the audit report were appropriate do not establish a policy or practice applied to <u>all</u> employees such that they can be considered similarly situated.  Further, the lack of any evidence by Opt-In Candiani and Felan supporting such a policy or practice of improperly changing time cannot support a finding that other employees were similarly situated for purposes of authorizing notice to all Servers, Bartenders and Gauchos who have worked for Defendant over a period of more than three (3) years.  While the time records of other employees might reflect that various changes were made to the official time record maintained within the POS system, the fact remains that any trial involving any opt-in plaintiffs would require a highly individualized assessment of the reasons for each such deduction -- an individualized assessment that is inappropriate within the context of a collective action that was created, as recognized in *Swales*, to provide efficiency.  (*See supra* at 2.)

Even more troublesome for purposes of Plaintiffs' attempt to demonstrate the existence of a class of similarly situated employees is her own discovery response.  Plaintiffs FLSA claims are premised in large part on a claim that Defendant "shaved time" to prevent employees from being paid overtime.  (*See* Pls.' Mot. at 9).  In support of her allegations, Plaintiff Nathaly Cortez produced as "Exhibit A" to her Response to Defendant's First Set of Interrogatories (attached hereto and incorporated herein by reference as Ex. H),[24] a spreadsheet purportedly summarizing

---

[24] Plaintiff's Responses to Interrogatory No. 3 reflects Plaintiff's contention that such "Exhibit A" identifies the dates on which hours worked are incorrect and/or the additional amount of time allegedly worked.  (*See* Ex. H at 5-6).

all of the "Clock In" and "Clock Out" times for each shift worked by her (based on the time records produced by Defendant), as well as the amount of alleged "Shaved Time" (based on the time audit report attached to Plaintiffs' Exhibit 1D). Such spreadsheet also identifies the "Total Hours Worked Per Week" for each shift worked. *See id.* Even assuming that such spreadsheet is correct, a review of the "Total Hours Worked Per Week" on Plaintiff's spreadsheet and the amount of allegedly "Shaved Time" reveals that *in only four (4) of the many weeks in which Plaintiff Nathaly Cortez worked would the sum of the "Total Hours Worked Per Week" and the "Shaved Time" result in forty (40) or more hours being worked* and, thus, overtime being owed. *See id.*[25] Plaintiffs produced <u>no additional evidence</u> of any Servers, Bartenders or Gauchos whose time records were changed so as to prevent them from being paid overtime, despite having been provided with time records, time audit reports and paystubs of thirteen (13) individuals. If this Court authorizes notice to all Servers, Bartenders and Gauchos employed by Defendant for over three (3) years, and if the time audit reports for some of the individuals who might choose to opt-in reflect changes to their time records, any trial would not only have to include the individualized examination of the various reasons for each such time record change and whether such change was appropriate (as discussed previously), but such trial would also have to include an examination of the time and payroll records for each week in which any allegedly inappropriate changes were made in order to determine if overtime would have been owed.

Clearly, it cannot be found that Plaintiffs met their burden of proving that employees are similarly situated with respect to changes in their time record resulting in unpaid overtime, and it

---

[25] Only the workweeks beginning "Friday, November 20, 2020," "Friday, April 2, 2021," Friday, April 16, 2021," and "Friday, May 14, 2021" would result in more than forty (40) hours being worked, if the "Shaved Time" for the given week were added to the "Total Hours Worked Per Week" for that week.

cannot be found that the purposes of the FLSA's collective provisions would be served by the many individualized mini-trials that would result from opt-ins participating in this matter. For these reasons, the Court must find that there are no similarly situated employees and deny Plaintiff's Motion.

## V. NOTICES SHOULD NOT BE ISSUED TO ALL SERVERS, BARTENDERS AND GAUCHOS.

Although Defendant maintains that notice to any of the Servers, Bartenders and Gauchos would be inappropriate for the reasons discussed herein, if it is found that any of Plaintiff's contentions support a claim that, in some respect, others may be similarly situated in some way, the Court should not authorize notice to all Servers, Bartenders and Gauchos who have worked for Defendant in the period of time requested by Plaintiffs. Instead, recognizing the options identified by the Fifth Circuit in *Swales* (*see supra* at 4), this Court should either order that additional discovery take place to further enable the Court to evaluate Plaintiffs' contentions or authorize notice to a discrete subgroup of the proposed class. Based on the failed arguments of Plaintiffs as discussed herein, it is difficult to identify a subgroup of Plaintiffs' requested class to which the requested notice would be appropriate, but this Court can only meet the obligations recognized by *Swales* and imposed by the text of the FLSA and the Supreme Court's decision in *Hoffman LaRoche* (*see supra* at 2) by authorizing a targeted notice directed only to those specifically found to be similarly situated in some way to Plaintiffs.

## VI. THE COURT SHOULD NOT REQUIRE THE PRODUCTION OF INFORMATION SOUGHT BY PLAINTIFFS NOR PROVIDE THE NOTICES REQUESTED.

Finally, even if the Court finds notice to some group of employees to be appropriate, Defendant objects to various forms of notice requested by Plaintiffs. Although Defendant concedes that disclosure of the names and email addresses of proposed class members is common, and that sixty (60) days is generally found to be a reasonable period within which individuals must

4870-1961-5542.2

opt in, Defendant objects to Plaintiffs' request for authority to issue notices by text message and the corresponding request that Defendant provide the telephone numbers of the putative class members. While Plaintiffs correctly note that notice via text has been authorized by some courts, and while Defendant is aware of this Court's position that notice via text may be appropriate, *see, e.g., Thrower v. Universal Pegasus, Int'l Inc*., 484 F. Supp. 3d 473, 489-90) (S.D. Tex. 2020), Defendant believes that such notice is unduly intrusive into the privacy of the putative class members and that any Order requiring Defendant to provide, if known, the last-known mobile telephone numbers of putative class members must be coupled with an Order that none of the individuals be contacted via telephone.

In identifying their proposed methods of notice, Plaintiffs only specifically identify email, text message, notice reminder and posting in their numbered list (*see* Pls.' Mot. at 26-29), but, hidden within the text of Plaintiffs' Motion is a request that the Court, "due to the transient nature of the Tipped Employees, authorize Plaintiff to make reminder calls shortly before the end of the opt-in period to Tipped Employees who have not responded after the mailing of the initial notice." *Id*. at 26. Sending a reminder notice by text and email (*see* Pls.' Mot. at 29) after notice has also been sent via email and text message should certainly suffice to ensure that putative class members are aware of their right to opt-in. Permitting Plaintiffs to use the same phone number utilized for a proposed text message to make a call[26] to each of the putative class members is unnecessarily intrusive and implicates serious privacy and ethical concerns. *See, e.g., Harris v. Vector Mktg. Corp*., 716 F. Supp. 2d 835, 847 (N.D. Cal. 2010) ("a postcard is not especially invasive (e.g.,

---

[26] It should go without saying that if an individual does not respond to either an initial or reminder text message sent to his/her mobile phone number, a personal call to that same number would likely be viewed by the individual as harassing and should be viewed by this Court as both harassing and unnecessary.

compared to a telephone call)."); *In re Wells Fargo Wage & Hour Emp't Practices Litig.*, No. H-11-2266, 2013 U.S. Dist. LEXIS 70040, at *9-10 (S.D. Tex. May 17, 2013) (denying the plaintiffs' request to send reminder notices via recorded telephone messages). Oral telephone communications between potential plaintiffs and attorneys, or those acting on behalf of attorneys, present potential ethical concerns. *See, e.g., Harvey v. AB Electrolux*, 857 F. Supp. 2d 815, 820 (D. Iowa Mar. 9, 2012) ("I believe that there are legitimate concerns with improper solicitation, even unintentional, and privacy that counsel against providing telephone numbers."); *see also Bishop v. AT&T Corp.*, 256 F.R.D. 503, 509 (W.D. Penn. 2009); *Russell v. Ill. Bell Tel. Co.*, 575 F. Supp. 2d 930, 939 (N.D. Ill. 2008). The Texas Disciplinary Rules of Professional Conduct limit telephone communications by, or on behalf of, attorneys in contacting prospective clients: "A lawyer shall not by in-person or telephone contact seek professional employment concerning a matter arising out of a particular occurrence or event, or series of occurrences or events, from a prospective client or nonclient who has not sought the lawyer's advice regarding employment or with whom the lawyer has no family or past or present attorney-client relationship when a significant motive for the lawyer's doing so is the lawyer's pecuniary gain." TEX. DISCIPLINARY R. PROF'L CONDUCT 7.03.

In light of the invasiveness of telephone calls and the potential for inadvertent ethical violations, "[t]he need for limitations on counsel contact with potential class members is strongest during the opt-in period, when potential plaintiffs must decide whether to join the litigation." *McKnight v. D. Houston, Inc.*, No. H-09-3345, 2010 U.S. Dist. LEXIS 129634, *3 (S.D. Tex. Dec. 8, 2010). "Telephone calls raise issues of what was said during the call to a much greater degree than mailing or email." *Ott*, 298 F.R.D. at 553. "Because of the potential for abuse, a district court has both the duty and the broad authority to exercise control over a class action and to enter

appropriate orders governing the conduct of counsel and the parties." *Spence v. Irving Holdings, Inc.*, No. 3:10-cv-142, 2010 U.S. Dist. LEXIS 140329, at *4 (N.D. Tex. Dec. 15, 2010) (quoting Gulf Oil Co. v. Bernard, 452 U.S. 89, 100 (1981)).

"The purpose of notice is simply to inform potential class members of their rights.  Once they receive that information, it is their responsibility to act as they see fit." *Byard v. Verizon W. Va., Inc.*, 287 F.R.D. 365, 373 (N.D. W. Va. 2012) (citations omitted) (discussing concerns that requested reminder notice will stir up litigation and inappropriately encourage putative plaintiffs to join the suit).  Permitting such repeated contacts – especially if the Court permits the initial notice to potential class members to take place through more than one means of delivery, *e.g.*, email and text, *etc.* – results in an exponentially larger number of duplicative/harassing notices to potential class members without any indication that they did not receive the initial notice(s).  To the extent, then, that the Court requires Defendant to produce potential class members' telephone numbers, Defendant requests that the Court's order prohibit telephone communications with prospective plaintiffs.  If Plaintiffs can somehow justify such an intrusive and harassing (especially in light of the other notices and reminder notices requested) form of notice Defendant asks that the Court require a third-party service, to be paid for by Plaintiffs, to make the calls utilizing an approved script that simply notifies the individuals called of the same general information as provided other approved notices.

With respect to the actual forms of notice(s) requested by Plaintiffs, Defendant asks that the Court revise Plaintiffs' proposed Notices (*see* Pls.' Ex. 22 [Dkt # 45-33] (notice to putative class members); Pls.' Ex. 23 [Dkt # 45-34] (proposed email to transmit notice); Pls.' Ex. 24 [Dkt # 45-35] (proposed text to transmit notice); *see also* Pls.' Mot. [Dkt # 45] at 26 and 29-30 (seeking ability to call potential class members and posting of notice at Defendant's restaurant)), as to which

Defendant has several objections, and limit the information sought by Plaintiffs related to potential class members' phone numbers, social security numbers and dates of birth.  (*See* Pls. Mot. [Dkt # 45] at 24-25).

Given the explicit recognition in *Swales* that the Court is not to "signal approval of the merits or otherwise stir up litigation," 985 F.3d at 43, Defendant objects to Plaintiff's proposed notice to putative class members (*see* Pls.' Ex. 22 [Dkt # 45-33]).  The notice provides Plaintiffs' position with respect to the matter under the "What is this case about?" heading, but it does not provide any indication that Defendant denies the claims.  Any notice should include statements that:

> Casa do Brasil denies Plaintiffs' allegations.  Caso do Brasil contends that Plaintiffs and other Servers, Bartenders and Gauchos have been, and continue to be, properly paid under the FLSA, and Defendant has asserted various defenses to Plaintiffs' claims.

> The Court has not considered or made any decisions about who is right.  Although the Court has authorized the sending of this Notice, there is no assurance that the Court will grant any relief in this case.

Relatedly, following the final sentence in the second paragraph under "What happens if I join?," the following should be included:  "Rather, Tran Law Firm will be paid an amount awarded by the Court out of any recovery, if any, obtained through trial or settlement."  Further, the notice should include the following language under the "What happens if I join?" section:  "If you decide to join the lawsuit, you may be required to answer written questions, appear for a deposition and/or testify at trial with regard to your claims against Casa do Brasil."  Importantly, the last sentence under the "What if I do not join?" section should be deleted and replaced with "If Plaintiffs lose the case, you will receive nothing and will be bound by the decision, but you will not have to pay anything, unless the Court finds that Plaintiffs should be required to pay Defendant's costs in the litigation, as may be permitted by law."  Additionally, under the "How quickly must I act to join?" section,

35

the following should be added:  "If you do not wish to be a part of the lawsuit, you do not need to do anything.  The decision to join is entirely yours."

Defendant also objects to Plaintiffs' proposed email to putative class members (*see* Pls.' Ex. 23 [Dkt # 45-34]) as drafted.  As the notice to be linked to the email provides putative class members with all of the relevant information, any such additional information is unnecessary and could be found to improperly signal approval of the claims, stating that the link "explains the steps you need to take if you want to join."  Any such email should simply state that, "You are receiving this email because Casa do Brasil's records indicate that you may be eligible to participate in a lawsuit filed against it.  LINK is the court-authorized Notice regarding the lawsuit."  Providing further instruction regarding the manner in which to opt in and contact information for Plaintiffs' counsel (both of which are included in the notice) is unnecessary.

For the same reasons, and if the Court permits notice via text message, Defendant objects to Plaintiffs' proposed text message to putative class members (*see* Pls.' Ex. 24 [Dkt # 45-35]) as drafted.  Defendant asks that the revisions requested with respect to the proposed email message be similarly made to the proposed text message.

## VII.    CONCLUSION

For the reasons identified herein and based upon the precedent similarly identified, Defendant asks that Plaintiffs' Motion be denied, that Plaintiffs' requested Notice not be issued to Defendant's Servers, Bartenders and Gauchos as requested and that Defendant not be required to provide Plaintiffs with all of the information sought in their Motion.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendant asks that Plaintiff's Motion be denied and that the Court grant Defendant such other and further relief, at law or at equity, to which it may be justly entitled.

4870-1961-5542.2

Respectfully submitted,

/s/ Ramon D. Bissmeyer
**Ramon D. Bissmeyer**
State Bar No. 00787088
So. Dist. No. 17446
**DYKEMA GOSSETT PLLC**
112 East Pecan Street, Suite 1800
San Antonio, Texas 78205
Telephone:   (210) 554-5500
Facsimile:    (210) 226-8395
Email:  rbissmeyer@dykema.com

and


**Elizabeth A. Voss**
State Bar No. 24075160
So. Dist. No. 1241751
**DYKEMA GOSSETT PLLC**
1717 Main Street, Suite 4200
Dallas, Texas 75201
Telephone:  (214) 462-6400
Facsimile:  (214) 462-6401
Email:  evoss@dykema.com

**ATTORNEYS FOR DEFENDANT**
**CASA DO BRASIL, LLC**


## CERTIFICATE OF SERVICE

I hereby certify that on October 11, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Trang Q. Tran
Tran Law Firm
2537 S. Gessner Suite 104
Houston, Texas 77063
Trang@tranlf.com
service@tranlf.com

/s/ Ramon D. Bissmeyer
Counsel for Defendant

37